# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| **MADDEN GULF COAST LLC** | **CIVIL ACTION** |
| **VERSUS** | **No. 24-2233** |
| **HILARK INDUSTRIES, INC., ET AL.** | **SECTION I** |

## ORDER AND REASONS

Before the Court are two motions for summary judgment filed by the defendants in this case. The first is a motion[1] for partial summary judgment filed by defendants Hilark Industries, Inc.; Hilbilt Sales Corp.; Hill G3 Industries, Inc.; and Grayling V. Hill (collectively, the "Hilbilt defendants"). Defendants Hilbilt-Lufkin Distribution, LLC and Hilark-Lufkin Heavy Haul Trucks & Trailers, LLC (collectively, "the Lufkin defendants") joined[2] in the Hilbilt defendants' motion. Plaintiff Madden Gulf Coast, LLC ("Madden") filed a response in opposition,[3] and the Hilbilt defendants filed a reply.[4]

The second motion is the Lufkin defendants' motion[5] for summary judgment. Madden filed a response[6] in opposition, and the Lufkin defendants filed a reply.[7] For

---

[1] R. Doc. No. 67.
[2] R. Doc. No. 100.
[3] R. Doc. No. 79.
[4] R. Doc. No. 92.
[5] R. Doc. No. 41.
[6] R. Doc. No. 78.
[7] R. Doc. No. 102.

the reasons that follow, the Court grants both motions in part and denies them in part.

## I. BACKGROUND

This action arises from the alleged wrongful conduct of the Hilbilt and Lufkin defendants (collectively, "defendants") "in connection with the engineering, design, research, testing, manufacture, production, inspection, installation, sale, distribution and/or warranty of six 19-foot steel dump bodies that [d]efendants manufactured and installed on six new 2023 Western Star 47X vocational quad axle dump trucks" ("quad trucks").[8] The Hilbilt defendants are the original sellers and manufacturers of the dump bodies at issue. The Lufkin defendants have since purchased the assets of the Hilbilt defendants, leading to a dispute between the parties regarding who is the proper defendant for each of Madden's causes of action. Grayling V. Hill ("Mr. Hill") was allegedly the owner and president of the Hilbilt entities and became the president of the Lufkin defendants after the asset purchase.[9]

Madden's amended complaint states that, in November 2021, Madden leased 19 new trucks, including 6 quad trucks from Daimler Truck through an agreement with Daimler Truck and/or Lonestar Freightliner Group, LLC ("Lonestar").[10] Madden "specified that the six Quad trucks were to be equipped with Hilbilt steel dump

---

[8] R. Doc. No. 106, ¶ 1.
[9] *Id.* ¶ 15.
[10] *Id.* ¶ 20.

bodies," and "Lonestar made arrangements with Defendant Hilbilt Sales to purchase six Hilbilt dump bodies for the six new Quad trucks Madden was to lease."[11]

After the six quad trucks were delivered to Madden, Madden began to operate them.[12] On September 12, 2023, the amended complaint states that one of the quad trucks turned over while offloading asphalt.[13] And on September 17, 2023, another quad truck turned over while dumping milling material.[14] Madden states that the two quad trucks that turned over were severely damaged, and an employee who was driving one of the trucks when it turned over was injured.[15] Madden decided to take the other four quad trucks out of service following the accidents to determine what had occurred.[16]

Complicating the question of which party may be liable for the rollover incidents, the amended complaint states that on September 11, 2023, the day before the first rollover incident, the Hilbilt defendants and the Lufkin defendants' parent company, Saddlebrook Heavy Haul Manufacturing, LLC, entered into an asset purchase agreement ("APA").[17] The Lufkin defendants later became parties to the agreement, became "the operating companies of the purchased Hilark and Hilbilt

---

[11] *Id.* ¶¶ 22–23.
[12] *Id.* ¶¶ 34, 36.
[13] *Id.* ¶ 40.
[14] *Id.* ¶ 43.
[15] *Id.* ¶¶ 50, 53.
[16] *Id.* ¶ 49.
[17] *Id.* ¶ 61.

businesses respectively," and assumed liabilities owned by the Hilbilt defendants.[18] The closing date for the APA was on November 3, 2023.[19]

Regarding Mr. Hill, the amended complaint alleges that the APA placed Mr. Hill in multiple roles and conflicting positions that "affected his conduct and candor."[20] Madden argues that Mr. Hill had a duty to disclose to Madden the fact that he had sold his businesses to the Lufkin defendants.[21] However, Madden alleges that Mr. Hill did not disclose to Madden that he had sold the businesses "in order to obtain an unjust advantage for himself."[22]

On December 1, 2023—after the rollover incidents—Mr. Hill allegedly inspected the six quad trucks at Madden's facility.[23] Madden states that Mr. Hill asked it to send the four undamaged quad trucks to the Lufkin defendants' facility where Mr. Hill could perform a better inspection and fix the problems with the dump bodies.[24] Madden delivered the quad trucks to the Lufkin defendants' facility.[25]

Yet the amended complaint alleges that Mr. Hill waited until late January 2024 to notify Madden that he would not be fixing the dump beds, stating that his insurance company told him to do nothing because it could amount to an admission of fault.[26] Madden then told Mr. Hill that it would fix the issues with the dump beds

---

[18] *Id.* ¶¶ 62–64.
[19] *Id.* ¶ 66.
[20] *Id.* ¶ 76.
[21] *Id.* ¶ 81.
[22] *Id.* ¶ 82.
[23] *Id.* ¶ 78.
[24] *Id.* ¶ 83.
[25] *Id.* ¶ 84.
[26] *Id.* ¶¶ 87, 89.

itself, but it alleges that Mr. Hill asked that he be allowed to keep the dump beds for a few more weeks to reconsider whether he would fix the dump beds.[27] On February 16, 2024, the amended complaint states that Mr. Hill asked Madden to pick up the four undamaged quad trucks because he was in the middle of selling his business and did not want to do anything to impact the sale.[28] Madden alleges that this statement was false because Mr. Hill had already sold his business at that point.[29]

Madden then picked up the four undamaged quad trucks and brought them back to its own shop, where Madden repaired and modified the dump beds on those trucks.[30] Madden describes how, during this process, it allegedly learned that defendants had modified the hydraulic dump cylinder mounting arm design on the dump bodies without making Madden aware of the changes.[31] Madden maintains that many of the welds on the dump bodies were either defective or inadequate.[32]

Having found these alleged defects, Madden states that it contacted Mr. Hill regarding its claims to ask that he repair or replace the trucks and dump bodies of the trucks involved in the rollover incidents.[33] Madden contends, however, that defendants have continued to refuse to act on its claims regarding the two trucks and dump bodies damaged in the rollover incidents.[34] This refusal, Madden alleges, has

---

[27] *Id.* ¶ 88.
[28] *Id.* ¶ 89.
[29] *Id.*
[30] *Id.* ¶ 98.
[31] *Id.* ¶¶ 100–01.
[32] *Id.* ¶¶ 104–05.
[33] *Id.* ¶¶ 108–09.
[34] *Id.* ¶ 112.

been "in part due to concerns regarding a potential admission of liability with respect to the possible claims by the driver of the Quad truck involved in the September 12, 2023 rollover accident."[35]

Because of the alleged "defective dump bodies, the resulting September 12 and September 17, 2023 Accidents" and defendants' failure to either fix or replace the dump bodies, Madden maintains that that it has sustained multiple categories of damages.[36] Relevant for the present motions, Madden brings claims for violations of the Louisiana Products Liability Act ("LPLA"), negligence, breach of warranty for fitness of use, breach of express warranty, and redhibition.[37] Madden also brings personal claims against Mr. Hill and claims for negligence and vicarious liability against the Lufkin defendants based on Mr. Hill's actions as an employee.[38]

The Hilbilt defendants and the Lufkin defendants then filed their respective motions for summary judgment.[39] After defendants filed their motions, the Court granted Madden leave to amend its complaint.[40] Nonetheless, the Court addresses defendants' arguments as applied to Madden's amended complaint.

Both the Hilbilt defendants and the Lufkin defendants argue that Madden's claims for negligence should be dismissed because those claims do not arise under the LPLA, and the LPLA provides the exclusive theory of liability for damages

---

[35] *Id.* ¶ 112.

[36] *Id.* ¶ 129.

[37] *Id.* at 26, 31, 33–35, 41.

[38] *Id.* at 43, 45.

[39] R. Doc. No. 67 (Hilbilt defendants' motion for summary judgment); R. Doc. No. 41 (Lufkin defendants' motion for summary judgment).

[40] R. Doc. No. 105.

6

proximately caused by a product.[41] Defendants also argue that Madden's claims for property damage should be dismissed because Madden does not own the trucks or dump bodies.[42] They maintain that Madden's claims for damages related to workers' compensation payments should be dismissed because Madden has not directly paid any of the workers' compensation payments.[43] Lastly, defendants jointly argue that all claims against Mr. Hill should be dismissed because he is not a manufacturer pursuant to the LPLA and because he cannot be held liable individually for his actions taken related to his duties as president of the companies involved.[44]

The Lufkin defendants individually argue that they are not manufacturers pursuant to the LPLA and therefore cannot be held liable for products liability.[45] Additionally, the Lufkin defendants argue that they did not assume the Hilbilt defendants' liabilities or warranty obligations with respect to Madden through the APA.[46]

## II.    STANDARD OF LAW

Summary judgment is proper when, after reviewing the materials in the record, a court determines that there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "[A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the

---

[41] R. Doc. No. 67-1, at 4; R. Doc. No. 41-1, at 4.
[42] R. Doc. No. 67-1, at 11.
[43] *Id.* at 15.
[44] *Id.* at 7, 9.
[45] R. Doc. No. 41, at 2.
[46] *Id.*

record] which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The party seeking summary judgment need not produce evidence negating the existence of a material fact; it need only point out the absence of evidence supporting the other party's case. *Id.*; *see also Fontenot v. Upjohn Co.*, 780 F.2d 1190, 1195–96 (5th Cir. 1986) ("There is no sound reason why conclusory allegations should suffice to require a trial when there is no evidence to support them even if the movant lacks contrary evidence.").

Once the party seeking summary judgment carries that burden, the nonmoving party must come forward with specific facts showing that there is a genuine dispute of material fact for trial. *See Matsushita Elec. Indus. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). The showing of a genuine dispute is not satisfied by creating "'some metaphysical doubt as to the material facts,' by 'conclusory allegations,' by 'unsubstantiated assertions,' or by only a 'scintilla' of evidence." *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (citations omitted). Rather, a genuine dispute of material fact exists when the "evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). If the nonmovant fails to meet its burden of showing a genuine issue for trial that could support a judgment in favor of the nonmovant, summary judgment must be granted. *See Little*, 37 F.3d at 1075–76.

The party responding to the motion for summary judgment may not rest upon the pleadings but must identify specific facts that establish a genuine issue. *Anderson*, 477 U.S. at 248. The nonmoving party's evidence, however, "is to be

believed, and all justifiable inferences are to be drawn in [the nonmoving party's] favor." *Id.* at 255. "Although the substance or content of the evidence submitted to support or dispute a fact on summary judgment must be admissible . . . the material may be presented in a form that would not, in itself, be admissible at trial." *JW Dev., LLC v. Indep. Specialty Ins. Co.*, Civ. A. No. 22-390, 2022 WL 3139133, at *1 (E.D. La. Aug. 5, 2022) (Africk, J.) (quoting *Lee v. Offshore Logistical & Transp., LLC*, 859 F.3d 353, 355 (5th Cir. 2017)).

## III.   ANALYSIS

### a.  Hilbilt and Lufkin Defendants' Joint Arguments

#### i.   *Non-LPLA Claims*

The Hilbilt and Lufkin defendants each argue in their motions that all non-LPLA claims must be dismissed because the LPLA provides the exclusive theories of liabilities for damages proximately caused by a product.[47] In particular, the Hilbilt defendants argue that "the LPLA does not authorize claims for negligence" and that "those claims should be dismissed as a matter of law."[48]

Madden agrees that the LPLA and redhibition[49] law govern its claims for property damage and personal injuries.[50] However, it argues that other causes of

---

[47] R. Doc. No. 67-1, at 4; R. Doc. No. 41-1, at 6–8.

[48] R. Doc. No. 67-1, at 4.

[49] In Louisiana, redhibition is "the avoidance of a sale on account of some vice or defect in the thing sold which renders the thing either absolutely useless or its use so inconvenient and imperfect that it must be supposed that the buyer would not have purchased it had he known of the vice." *Vitter v. Blaize*, 376 So. 3d 193, 196 (La. Ct. App., 2023); *see also* La. C.C. art. 2520.

[50] R. Doc. No. 79, at 7.

action are available for defendants' post-rollover conduct.[51] Madden argues that the Hilbilt defendants' warranty obligated them "to repair and replace issues with dump bodies or replace them."[52] The Lufkin defendants, Madden argues, assumed warranty obligations either by the terms of the APA or by the Lufkin defendants' independent actions in accepting the trucks for repairs and holding them for several months without communicating to Madden that its warranty claim was being rejected.[53]

Madden further alleges that Mr. Hill is liable for his actions in leading Madden to believe that the four remaining quad trucks would be fixed.[54] Madden states that Mr. Hill "was authorized to receive, accept, administer, and approve warranty claims" without any formal procedures and that he took possession of the trucks from December to February without doing any work to repair the trucks.[55] Madden maintains that it relied on representations that the trucks would be repaired and that it never received any communications that its warranty claim was being rejected.[56] Madden thereby states that its claims regarding this conduct are not barred by the LPLA.[57]

The LPLA "establishes the exclusive theories of liability" pursuant to Louisiana law against manufacturers for damage caused by their products. *Pramann v. Janssen Pharms., Inc.*, Civ. A. No. 16-12413, 2017 WL 58469, at *2 (E.D. La. Jan.

---

[51] *Id.* at 8–10; R. Doc. No. 78, at 9, 12–15.

[52] R. Doc. No. 79, at 9.

[53] R. Doc. No. 78, at 9–15.

[54] R. Doc. No. 79, at 9.

[55] *Id.* at 9–10.

[56] *Id.* at 10.

[57] *Id.*

5, 2017) (Africk, J.) (quoting La. Stat. § 9:2800.52 and citing *Jefferson v. Lead Indus. Ass'n*, 106 F.3d 1245, 1248 (5th Cir. 1997)). To succeed on a claim pursuant to the LPLA, a plaintiff must prove four elements:

> (1) that the defendant is a manufacturer of the product; (2) that the [plaintiff's] damage was proximately caused by a characteristic of the product; (3) that this characteristic made the product "unreasonably dangerous"; and (4) that the [plaintiff's] damage arose from a reasonably anticipated use of the product by the [plaintiff] or someone else.

*Stahl v. Novartis Pharms. Corp.*, 283 F.3d 254, 260–61 (5th Cir. 2002) (citing La. Stat. § 9:2800.54(A)).

A product is unreasonably dangerous pursuant to the LPLA "if and only if" the product is "unreasonably dangerous either (1) in construction or composition, (2) in design, (3) because of inadequate warning, or (4) because of nonconformity to an express warranty." *Rhodes v. Covidien LP*, Civ. A. No. 18-10667, 2019 WL 2162845, at *2 (E.D. La. May 17, 2019) (Vance, J.) (internal citation omitted). "Thus, the LPLA limits the plaintiff to four theories of recovery: construction or composition defect, design defect, inadequate warning, and breach of express warranty." *Id.* "[F]or causes of action arising after the effective date of the LPLA, negligence, strict liability, and breach of express warranty are not available as theories of recovery against a manufacturer, independent from the LPLA." *Stahl*, 283 F.3d at 261.

However, the LPLA only limits the theories of liability for manufacturers with respect to "damage caused by their products." La. R.S. § 9:2800.52. The LPLA defines damage as follows:

> Damage means all damage caused by a product, including survival and wrongful death damages, for which Civil Code Articles 2315, 2315.1 and 2315.2 allow recovery. "Damage" includes damage to the product itself and economic

loss arising from a deficiency in or loss of use of the product only to the extent that Chapter 9 of Title VII of Book III of the Civil Code, entitled "Redhibition," does not allow recovery for such damage or economic loss. Attorney's fees are not recoverable under this Chapter.

La. R.S. § 9:2800.53(5).

"While the LPLA governs products liability in *tort,* it does not preclude recovery for economic loss arising from breach of warranty or breach of contract." *McAuslin v. Grinnell Corp.*, Civ. A. No. 97-775, 2001 WL 8584, at *2 (E.D. La. Jan. 3, 2001) (Vance, J.). Explicitly not covered by the LPLA, the articles appearing in Chapter 9 of Title VII of Book III of the Louisiana Civil Code—although entitled redhibition—cover not only redhibition but also the seller's obligation to deliver a thing reasonably fit for its ordinary use, La. C.C. art. 2524, and actions for breach of contract because the thing delivered is not of the kind or quality specified in the contract. La. C.C. art. 2529. "[D]amages for breach of contract, including but not limited to redhibition, are recoverable from a product manufacturer under these articles of the Civil Code." *C-Innovation, LLC v. Norddeutsche Seekabelewerke GMBH*, Civ. A. No. 10-4441, 2013 WL 990026, at *4 (E.D. La. Mar. 13, 2013) (Morgan, J.). Madden may therefore maintain its claims for breach of warranty independently from the LPLA to the extent that it relies on a breach-of-contract theory.

Likewise, Madden's claims for breach of warranty for fitness of use are not covered by the LPLA, and Madden may pursue these claims under a breach-of-contract theory. *See* La. C.C. art. 2524 (stating that, if an item is not fit for its ordinary use pursuant to the statute, "the buyers rights are governed by the general rules of

conventional obligations"); *see also Cunard Line Ltd. Co. v. Datrex, Inc.*, 926 So. 2d 109, 113 (La. Ct. App. 2006) (stating that when a buyer files a claim pursuant La. C.C. art. 2524, that claim "is one for breach of contract and not the action arising from the warranty against redhibitory defects" (internal citation and quotations omitted)).

Madden's claims for negligence are not provided for in the LPLA and must be dismissed to the extent that they sound in tort. However, part of Madden's amended complaint alleging negligence states that defendants' acts in taking possession of the four quad trucks under representations that they would be repaired, replaced, or modified and holding the trucks for two months without taking any action was negligent.[58] This portion of Madden's complaint appears to allege a negligence theory sounding in contract. "In the case of negligent breach of a contractual obligation, causes of action lie for both the breach of contract and the negligence." *Robertson v. Sun Life Fin.*, 187 So. 3d 473, 479 (La. Ct. App. 2013). Madden may therefore pursue its claims for negligence to the extent that they rest on a negligent breach-of-contract theory.

> ii.     *Property Damage Claims*

Defendants next argue that Madden cannot bring a claim for property damage because Madden is the lessee and not the owner of the equipment.[59] Defendants also argue that, pursuant to the lease agreement, the dump bodies that were added to the leased trucks are owned by the lessors of the equipment because the improvements

---

[58] R. Doc. No. 106, ¶ 162.
[59] R. Doc. No. 67-1, at 11–14.

"cannot be readily removed without causing damage to the equipment."[60] Accordingly, defendants argue that Madden also cannot bring a property damage claim for the dump bodies because it does not own them.[61]

However, as Madden points out in its response,[62] Louisiana law provides that a lessee is permitted to file an action "to protect the lessee's possession against a disturbance caused by a person who does not claim a right in the leased thing." La. C.C. art 2702. The Louisiana Supreme Court has clarified that article 2702 (formerly numbered 2703) affords "the lessee . . . a right of action for damages sustained against the person occasioning the disturbance." *Potter v. First Fed. Sav. & Loan Ass'n of Scotlandville*, 615 So. 2d 318, 323–24 (La. 1993). Defendants, as nonparties to the lease, do not argue that they "claim a right in the leased thing." *See* La. C.C. art 2702. Accordingly, Madden's status as a lessee does not prevent Madden from maintaining claims for property damage against defendants.

### iii.    Claims for Workers' Compensation Obligations

Defendants next ask that this Court dismiss Madden's claims "for damages related to the recovery of payments made by Boulder Insurance, LTD related to [the injured driver's] workers' compensation claim."[63] Defendants argue that all of the driver's workers' compensation claims have been paid by Boulder Insurance, LTD ("Boulder Insurance"), who is not party to this litigation.[64] Though defendants state

---

[60] *Id.* at 14.

[61] *Id.*

[62] *See* R. Doc. No. 79, at 19.

[63] R. Doc. No. 67-1, at 15.

[64] *Id.*

that Madden has claimed that it has been assigned the right to collect on the workers' compensation payments made by Boulder Insurance, defendants argue that Madden has offered no "additional explanation or evidence regarding this alleged right to assignment."[65]

In its response, Madden argues that the Louisiana Workers' Compensation Law ("LWCL") allows anyone who has paid or becomes obligated to pay workers' compensation to file a lawsuit against a third-party tortfeasor.[66] Because it is undisputed that Madden was obligated as the injured driver's employer to pay for injuries allegedly sustained in the rollover incident, Madden argues that it is immaterial whether it actually paid the workers' compensation or whether its insurer was the one to pay the claim.[67] Further, though Madden contends that such assignment is irrelevant, Madden produces a letter from Gallagher Bassett, its insurance provider's workers' compensation claim administrator, memorializing that Madden has been assigned the right to pursue this claim.[68] Defendants dispute the letter, stating that there is no evidence that Gallagher Bassett has authority to assign the right because Boulder Insurance was the one to pay the claim.[69]

---

[65] *Id.* at 15–16.

[66] R. Doc. No. 79, at 20–21 (citing La. R.S. 23:1101(B)).

[67] *Id.* at 21.

[68] *Id.* at 21–22.

[69] R. Doc. No. 92, at 5. Defendants' reply also argues that Madden's letter should be stricken because it was not produced in discovery and is dated after discovery in this case ended. *Id.* Because all deadlines are being extended in this matter following Madden's amended complaint, *see* R. Doc. No. 113, the Court declines to strike Madden's letter.

As provided for in Louisiana's workers' compensation scheme, the award of compensation to an injured employee "shall not affect the claim or right of action of the said employee . . . against [third persons legally liable to pay damages to the employee]." La. R.S. 23:1101(A). To prevent double recovery by an employee, employers and insurers are entitled to credit for any amounts paid by the third-party tortfeasor. Following any compromise of the claim between the employee and the third-party tortfeasor, insurers and employers are entitled to "dollar for dollar credit against the full amount paid in compromise, less attorney fees and costs paid by the employee in prosecution of the third party claim." La. R.S. 23:1102(B). In the event that an employee recovers damages from the third-party tortfeasor in court, "such damages shall be so apportioned in the judgment that the claim of the employer for the compensation actually paid shall take precedence over that of the injured employee or his dependent." La. R.S. 23:1103(A).

Employers and workers' compensation insurers likewise have their own right of action to recover benefits that they have paid to an injured employee from a third-party tortfeasor who is responsible for the damage. *Houston General Ins. Co. v. Commercial Union Ins. Co.*, 649 So. 2d at 781 (La. Ct. App. 1994). In pertinent part, La. R.S. 23:1101(B) provides:

> Any person having paid or having become obligated to pay compensation under the provisions of this Chapter may bring suit against such third person to recover any amount which he has paid or becomes obligated to pay as compensation to such employee or his dependents.

For purposes of the LWCL, insurers are explicitly "subrogated to all rights and actions which the employer is entitled," La. R.S. 23:1162(D), providing the insurer

16

with these same statutory rights to reimbursement against legally liable third persons. When an insurer recovers compensation paid on the employer's behalf from a third-party tortfeasor, "an insurer shall grant its insured a dollar-for-dollar credit for any amount on any claim paid . . . on the employer's behalf." La. R.S. 23:1103(D). However, compensation insurers are not subrogated to the employee's rights. *Dodson v. Old Republic Ins. Co.*, Civ. A. No. 98-3041, 1999 WL 329701, at *3 (E.D. La. May 21, 1999) (Clement, J.).

In order to promote timely intervention and to protect the parties from losing their rights under the statutory scheme, *see Haynes v. United Parcel Service*, 933 So.2d 765, 768 (La., 2006), Louisiana Revised Statute 23:1102 sets forth the obligation of giving notice by an injured employee or the employer or insurer in the event that one of them files suit against a third-party tortfeasor as authorized by La. R.S. 23:1101. The statute requires that if the employee, the employer, or the insurer sues the tortfeasor, he must notify the other parties so that they may intervene as a party plaintiff in the suit. La. R.S. 23:1102(A)(1).

Failure of an employee to notify his employer or the insurer of the third-party lawsuit may result in the employee forfeiting his right to future compensation, including medical benefits. La. R.S. 23:1102(B). Similarly, after proper notice is received, the failure of an employer or insurer to intervene bars the employer or insurer from bringing a separate suit against a third-party tortfeasor. *Rolls ex rel. A.R. v. Packaging Corp. of Am.*, Civ. A. No. 18-188, 2019 WL 13221922, at *2 (W.D. La. Sept. 24, 2019).

The LWCL therefore sets out a detailed scheme outlining the rights of employees, employers, and compensation insurers in suits against third-party tortfeasors. However, the statute does not address whether an employer has a right to recover compensation benefits paid by its insurer. The statute likewise does not address any reimbursement rights an insurer may have if its insured—acting on its insurer's behalf—recovers compensation benefits paid by the insurer. The Court is aware of no case addressing the issue. Nor do defendants cite to any authority in support of their argument that no such right exists.

The Court notes that, generally, a subrogated insurer that "has paid an entire loss suffered by the insured, it is the only real party in interest and must sue in its own name." *United States v. Aetna Cas. & Sur. Co.*, 338 U.S. 366, 390 (1949). Louisiana law has provided no statutory exception to this general rule. Accordingly, the Court concludes that a better reading of R.S. 23:1101(B) does not permit an employer to sue to recover compensation that has been or will be paid by its insurer.

Although the case did not concern whether an employer could recover pursuant to the LWCL for compensation benefits paid by its insurer, the court in *Johnson v. Qualawash Holdings, L.L.C.* considered a compensation insurer's argument that it must be permitted to join a lawsuit brought pursuant to the LWCL against a third party "because, if it were not so permitted, it would be barred from ever recovering directly from a third-party tortfeasor or the plaintiff." 990 F. Supp. 2d 629, 638 (W.D. La. 2014). The court there noted that the insured employer's inclusion in the lawsuit was not sufficient to protect the insurer's interests unless the contract between the

parties had a reimbursement clause. *Id.* at 639. Because the insurer only had rights to subrogation and not to reimbursement pursuant to the insurance policy, and because Louisiana law did not provide the insurer with a right to recover compensation paid unless it intervened, the court concluded that the insurer was a required party to the litigation pursuant to Federal Rule of Civil Procedure 19. *Id.* at 640.

The interests in recovery contemplated by R.S. 23:1101(B) belong to the person who has paid or will pay compensation. The Court is therefore persuaded that an employer has no statutory right to sue third parties to recover LWCL compensation which has been paid by its insurer. Here, Madden has not claimed that it has paid any LWCL compensation or that it will pay such compensation. Accordingly, Madden may not bring claims to recover payments made by Boulder Insurance absent some other assignment of rights.

Madden, however, has provided the Court with a letter from Boulder Insurance's claims administrator, memorializing that Madden has been assigned the right to pursue this claim.[70] This is proper summary judgment evidence in support of its contention that it been assigned Boulder Insurance's rights to sue to recover compensation payments made to Madden's employee. *See In re TK Boat Rentals, LLC*, 411 F. Supp. 3d 351, 374, 376–77 (E.D. La., 2019) (Ashe, J.) (concluding that an email exchange between counsel purporting to show an assignment of rights to an insurer

---

[70] *See* R. Doc. No. 79-22.

was competent summary judgment evidence in support of its argument that it had been assigned rights to pursue the claims at issue).

Although defendants dispute that there is no evidence that the claims administrator has authority to assign the right to sue,[71] this argument was raised in a reply brief. The Court therefore declines to grant summary judgment based on this argument. *See Davenport v. Manor*, Civ. A. No. 21-224, 2025 WL 542434, at *4 (M.D. La. Jan. 28, 2025) (citing cases for the proposition that courts need not consider arguments raised for the first time in a summary judgment reply brief). However, if Madden cannot produce evidence that the claims administrator had the requisite authority or that it was otherwise properly assigned Boulder Insurance's rights, defendants may reraise their argument at a later date.

iv.    *Claims Against Grayling V. Hill*

As the last of the joint arguments, defendants argue that Mr. Hill cannot be held liable pursuant to the LPLA because he is not a manufacturer.[72] Instead, they argue, he is merely "acting as President of companies who manufacture and sell products."[73] Defendants further argue that "there are no circumstances permitting the piercing of the corporate veil to hold Mr. Hill personally liable in this matter."[74]

Madden responds that there are genuine issues of fact regarding whether Mr. Hill can be held personally responsible because he allegedly designed the dump

---

[71] R. Doc. No. 92, at 5.
[72] R. Doc. No. 67-1, at 7.
[73] *Id.* at 8.
[74] *Id.*

bodies and committed fraud.[75] Madden states that Mr. Hill "personally made the defective engineering or design changes to the dump bodies in question and reviewed and approved the drawings of his modifications" while having "no certifications in welding or any other field" and while having no engineers on staff or assisting as consultants.[76] The amended complaint details various ways in which Mr. Hill was allegedly personally negligent in designing and directing the building of the dump bodies.[77] Madden also argues that there is a basis to pierce the corporate veil and hold Mr. Hill personally liable in this case because he allegedly committed fraud against Madden and was on both sides of the transaction when negotiating the APA, attempting to avoid liabilities through the sale.[78]

The LPLA defines a manufacturer generally as "a person or entity who is in the business of manufacturing a product for placement into trade or commerce." La. R.S. 9:2800.53(1). "'Manufacturing a product' means producing, making, fabricating, constructing, designing, remanufacturing, reconditioning or refurbishing a product." *Id.*

LPLA case law has established that whether a person or entity qualifies under the general definition of a manufacturer involves a two-pronged inquiry. First, a manufacturer must be "in the business" of "producing, making, fabricating, constructing, designing, remanufacturing, reconditioning or refurbishing a product."

---

[75] R. Doc. No. 79, at 10–11.
[76] *Id.* at 11.
[77] *Id.* at 12–13.
[78] *Id.* at 15–16.

La. R.S. 9:2800.53(1). Second, that individual or entity must place the product "into trade or commerce." *Id.*; *see also Singletary v. Crown Zellerbach*, 607 So. 2d 804, 809 (La. Ct. App. 1992). For example, in *Adelmann-Chester v. Kent*, the court concluded that a doctor who was one of the designers of the product at issue did not place the product into trade or commerce and could not be considered a manufacturer because he acted as a consultant, and he never "had control over the fabrication, construction, and marketing" of the product. 33 So. 3d 187, 199–201 (La. Ct. App., 2009).

Defendants do not cite to any law suggesting that a person who otherwise acts as a manufacturer within the meaning of the LPLA is shielded from liability when they act as an employee. However, the Fifth Circuit in *Reeves v. AcroMed Corp.*, suggested that the capacity in which an individual acts matters with respect to whether an individual meets the trade or commerce requirement. 103 F.3d 442 (5th Cir. 1997). In that case, the Fifth Circuit applying Louisiana law reversed the district court judgment holding Dr. Steffee liable as a manufacturer pursuant to the LPLA. *Id.* at 449. Although Dr. Steffee invented the product and acted in a leadership position as chairman of the board for the manufacturing company, the Fifth Circuit concluded that "he, *in his capacity of an individual person*, did not place the medical device on the market, introduce it into the stream of commerce, or act as a professional vendor of the product." *Id.* (emphasis added).

The same reasoning applies to Mr. Hill. Although Madden alleges that Mr. Hill designed the dump bodies and that Mr. Hill had a level of control as president of the Hilbilt defendants, Mr. Hill did not place the dump bodies into the stream of

22

commerce in his individual capacity. Instead, he did so in his capacity as president of the Hilbilt defendants. Mr. Hill is therefore not a manufacturer within the meaning of the LPLA.

However, Madden alleges that there is a basis for piercing the corporate veil and holding Mr. Hill individually liable for the defendant companies' actions. Madden's amended complaint alleges that Mr. Hill is liable for "the intentionally fraudulent misrepresentations he made to Madden, which were designed to mislead or deceive Madden in order to obtain an unjust advantage," such as by failing to disclose his status as president of the Lufkin defendants.[79] Madden accuses Mr. Hill of an "intentional and deceitful failure to handle Madden's warranty claims in a professional or businesslike manner."[80] Madden also alleges that Mr. Hill "had full authority and autonomy . . . to accept or deny warranty claims on behalf of [d]efendants."[81]

Madden's response to the Hilbilt defendants' motion for summary judgment further states that Mr. Hill knew about the rollover incident and was on both sides of the transaction for the APA, in which he went forward with an asset purchase with provisions "attempting to exclude liabilities . . . while transferring all assets to the Lufkin [d]efendants" and preventing the Hilbilt defendants from operating or using their name.[82] Madden states that this asset purchase left the Hilbilt defendants as

---

[79] R. Doc. No. 106, ¶¶ 221–25.
[80] *Id.* ¶ 229.
[81] *Id.* ¶¶ 96–97.
[82] R. Doc. No. 79, at 15–16.

shell companies and shifted liability to the "shell" Hilbilt defendants.[83] All the while, Madden states that Mr. Hill misrepresented the status of the sale and of insurance claims while Madden was awaiting repair of the trucks.[84] Madden alleges that these falsehoods were an attempt to escape liability.[85]

In Louisiana, "a corporation is a distinct legal entity, separate from the individuals who compose it, thus insulating the shareholders from personal liability." *Brennan's Inc. v. Colbert*, 85 So. 3d 787, 791 (La. Ct. App., 2012). In limited circumstances, however, "the court may ignore the corporate fiction and find the shareholders personally liable for the debts of a corporation." *Id.* Traditional veil-piercing doctrines are generally limited to cases where the separate existence of the corporation has been abused . . . ." *In re Gulf Fleet Holdings, Inc.*, 491 B.R. 747, 785 (Bankr. W.D. La. 2013).

One such exception to the corporate fiction is "where the shareholders disregard the corporate formalities to the extent that the corporation and the shareholders are no longer distinct entities." *Brennan's Inc.*, 85 So. 3d at 791. Another is where "the corporation is found to be the 'alter ego' of the shareholder," usually including a practice of fraud and deceit by shareholders. *Id.* In applying the alter ego doctrine, courts consider factors such as "(1) commingling of corporate or shareholder funds; (2) failure to follow statutory formalities for incorporating and transacting corporate affairs; (3) undercapitalization; (4) failure to provide separate bank

---

[83] *Id.* at 16.
[84] *Id.*
[85] *Id.*

accounts and bookkeeping records; and (5) failure to hold regular shareholder and director meetings." *Hill Int'l, Inc. v. JTS Realty Corp.*, 370 So. 3d 16, 20 (La. Ct. App., 2022).

As the Hilbilt defendants point out,[86] Madden's allegations of fraud by Mr. Hill do not appear in the original complaint. Instead, they appear in the amended complaint, which was filed after defendants filed this motion for summary judgment.[87] Accordingly, there are now factual disputes regarding whether there is a basis to hold Mr. Hill liable in his individual capacity for the actions of the defendant companies. The parties have not briefed whether these new factual allegations are legally sufficient to pierce the corporate veil, instead pointing only to a lack of evidence. Because the Court has recently extended the discovery deadlines in this case to allow time for the parties to address Madden's new claims, including its claims of fraud against Mr. Hill, the Court concludes that it is premature to dismiss Madden's claims against Mr. Hill.

### b. Lufkin Defendants' Arguments

#### i.    *APA-Assumed Liabilities*

The Lufkin defendants argue that because the Hilbilt defendants are the designers, manufacturers, and sellers of the dump bodies, Madden's redhibition claims and claims pursuant to the LPLA exist only against the Hilbilt defendants.[88] The Lufkin defendants point to a Texas choice-of-law provision in the APA and

---

[86] *See* R. Doc. No. 92, at 3–4.
[87] R. Doc. No. 106.
[88] R. Doc. No. 41-1, at 8–9.

contend that Texas law does not allow a buyer to assume a seller's liabilities unless the buyer does so expressly.[89] Because there is no provision in the APA under which the Lufkin defendants explicitly assume the Hilbilt defendants' liabilities, the Lufkin defendants argue that they cannot be liable pursuant to the LPLA or for redhibition.[90]

Regarding Madden's warranty claims, the Lufkin defendants assert that those claims lie against the Hilbilt defendants and that the Lufkin defendants have only agreed to assume warranty obligations for products that were sold before closing but where the claims were presented after closing—conditions that do not apply to Madden.[91] Further, even if the timing of Madden's warranty claims were not excluded from the Lufkin defendants' assumed liabilities, they argue that other limitations in the original warranty nonetheless exclude Madden's claims.[92]

Madden's response argues that Texas law does not apply to claims made by a third party who is not subject to the terms of the APA and that Louisiana law applies to its claims.[93] Furthermore, Madden argues that there are issues of fact regarding whether, regardless of the terms of the APA, Madden can prevail against the Lufkin defendants as apparent manufacturers pursuant to the LPLA.[94] Madden likewise argues that the Lufkin defendants can be held liable under a theory of successor liability, citing to Louisiana law in support.[95]

---

[89] *Id.* at 10.
[90] *Id.* at 12–13.
[91] *Id.* at 14.
[92] *Id.* at 15–16.
[93] R. Doc. No. 78, at 5, 9.
[94] *Id.* at 19.
[95] *Id.* at 21–22.

Regarding the argument that the Lufkin defendants did not assume warranty obligations that were asserted prior to the closing date, Madden asserts that this argument is unsupported by the text of the APA and that in assuming "warranty obligations incurred . . . prior to the Closing Date," the Lufkin defendants have assumed warranty obligations for Madden because the products at issue were sold prior to closing.[96] Moreover, even if the assumed warranties in the APA do not apply to Madden's claims, Madden argues that either the Lufkin defendants "assumed Madden's warranty claims by the superseding acts of their President," Mr. Hill or they created a new contractual obligation through those same actions.[97]

Pursuant to Louisiana law, contractual choice-of-law provisions are presumed valid, unless the chosen law "contravenes the public policy" of the state whose law would otherwise apply. *See* La. C.C. art. 3540; *see also Barnett v. Am. Const. Hoist, Inc.*, 91 So. 3d 345, 349 (La. Ct. App. 2012) ("A choice of law provision in a contract is presumed valid until it is proved invalid."). Here, Madden does not argue that the Texas choice-of-law provision is invalid. Instead, Madden argues that the choice-of-law provision is inapplicable to Madden because it is not a party to the contract. The Lufkin defendants concede that the choice-of-law provision does not apply to Madden to the extent that Madden makes claims concerning the Lufkin defendants' direct liabilities.[98] However, the Lufkin defendants maintain that the extent to which they

---

[96] *Id.* at 11–12.
[97] *Id.* at 12, 15.
[98] R. Doc. No. 102, at 1–2.

27

contractually assumed the liabilities of the Hilbilt defendants is determined by the APA.[99]

The Court agrees. Though the APA has no bearing on the Lufkin defendants' independent liabilities, the APA determines the extent to which the Lufkin defendants have assumed the Hilbilt defendants' liabilities. Courts routinely apply the parties' choice of law to determine the extent to which such liabilities are contractually assumed or created. *See, e.g.*, *Urda v. Valmont Indus. Inc.*, 561 F. Supp. 3d 640, 652–53 (M.D. La. 2021) (interpreting an indemnity agreement in accordance with the laws of Washington when the agreement contained a Washington choice-of-law provision).

With the applicable choice of law established, the Court now turns to the question of successor liability. Madden argues that the Lufkin defendants can be held liable as the Hilbilt defendants' successors because there are issues of fact with respect to whether the Lufkin defendants are a mere continuation of the Hilbilt defendants and whether the APA was entered into fraudulently to escape liability.[100] Some jurisdictions, including Louisiana, allow for successor liability where the purchaser is merely a continuation of the selling corporation or where the transaction is an attempt to escape liability. *See Golden State Bottling Co. v. N.L.R.B.*, 414 U.S. 168, 182 n.5 (1973) (setting out the general rule of corporate successor liability); *Monroe v. McDaniel*, 207 So. 3d 1172, 1180 (La. Ct. App. 2016) (stating that the

---

[99] *Id.* at 2.
[100] R. Doc. No. 78, at 21–23.

*Golden State Bottling Co.* "principle of successor liability has been followed by Louisiana Courts"). This Court, however, has established that Texas law governs the extent to which the Lufkin defendants assumed liabilities through the APA.

"Texas law does not generally recognize successor liability for subsequent purchases of corporate assets" unless the successor corporation expressly assumes the liabilities of the predecessor corporation. *UST-Mamiya, Inc. v. True Sports, Inc.*, 441 F. Supp. 3d 382 (N.D. Tex. 2020) (quoting *Renfro v. HCR Pool III Funding Corp.*, Civ. A. No. 05-2231, 2006 WL 8437652, at *1 (N.D. Tex. Aug. 28, 2006)). Indeed, Texas law has rejected all but the express assumption exception through statute, establishing that "[e]xcept as otherwise expressly provided by another statute, a person acquiring property described by this section may not be held responsible or liable for a liability or obligation of the transferring domestic entity that is not expressly assumed by the person." Tex. Bus. Orgs. Code § 10.254(b).

Through the language of this statute, Texas courts have reasoned that mere continuation and fraudulent transfer in attempt to escape liability are not grounds for successor liability. *See, e.g.*, *Shapolsky v. Brewton*, 56 S.W.3d 120, 137–39 (Tex. Ct. App. 2001). "Thus, only express assumption is grounds for successor liability under Texas law." *In re 1701 Com., LLC*, 511 B.R. 812, 824 (Bankr. N.D. Tex. 2014). Accordingly, the Lufkin defendants are not successors in liability for the Hilbilt defendants except to the extent that they expressly assumed those liabilities.

Section 2.04 of the APA, provides that the purchaser agreed to assume certain listed liabilities.[101] These include liabilities arising under assigned contracts and jobs in progress as well as amounts payable for inventory that had been ordered by the seller.[102] Most relevant here, the Lufkin defendants agreed pursuant to subsection b to assume the "warranty obligations incurred in the Ordinary Course of Business pursuant to Sellers' standard terms relating to goods sold or leased, or services performed, by Sellers prior to the Closing Date . . . ."[103] While the Lufkin defendants also agreed to assume "those liabilities and obligations of Sellers relating to the Purchased Assets or the Business and set forth in Section 2.04(d) of the Disclosure Schedules,"[104] that section states only "None."[105]

Accordingly, the only liabilities related to this case that the Lufkin defendants may have arguably assumed from the Hilbilt defendants through the APA are its warranty obligations. With respect to these potential warranty claims, the Lufkin defendants argue that the language of the APA establishes that they agreed only to assume "warranty obligations for products sold before the Closing for product-warranty claims asserted *after* the Closing date."[106] Because the rollover events occurred in September 2023 and Madden's claims were presented to the Hilbilt

---

[101] R. Doc. No. 41-4, at 5.
[102] *Id.* at 5–6.
[103] *Id.*
[104] *Id.* at 6.
[105] *Id.* at 82.
[106] R. Doc. No. 41-1, at 14.

defendants before the November 3, 2023 closing date, the Lufkin defendants argue that it did not assume liabilities for Madden's claims.[107]

Madden disputes the Lufkin defendants' reading requiring that a claim be asserted before the closing date for the Lufkin defendants to have assumed warranty obligations.[108] In particular, it argues that the language of the APA includes no language regarding when a claim or obligation must be asserted.[109] Instead, Madden argues that the Lufkin defendants assumed all warranty obligations pursuant to goods that were sold or leased prior to the closing date, regardless of when the claim was presented.[110]

In interpreting the APA, Texas contract interpretation law dictates that "[i]f [a contract] is worded so that it can be given a definite or certain legal meaning, it is not ambiguous and [the court will] construe it as a matter of law." *Am. Mfrs. Mut. Ins. Co. v. Schaefer*, 124 S.W.3d 154, 157 (Tex. 2003). "Whether a contract is ambiguous is itself a question of law." *Id.* The fact that the parties offer different contract interpretations does not create an ambiguity. *See id.* "An ambiguity exists only if the contract language is susceptible to two or more reasonable interpretations." *Tex. Indus., Inc. v. Factory Mut. Ins. Co.*, 486 F.3d 844, 846 (5th Cir. 2007).

---

[107] *Id.*
[108] R. Doc. No. 78, at 1–12.
[109] *Id.*
[110] *Id.*

The Court concludes that Madden's reading of section 2.04 of the APA is the correct reading. The section of the APA regarding the assumption of warranty obligations contains no language concerning when a claim is asserted. Instead, it only contains language concerning obligations "incurred" prior to the closing date. Importantly, warranty obligations are created when the warranty is made, not when a claim is asserted. *See, e.g.*, *Ford Motor Co. v. Miles*, 967 S.W.2d 377, 381 (Tex. 1998) (describing a sales contract as "creat[ing] warranty obligations"). Accordingly, the Court cannot conclude that the Lufkin defendants' reading is a reasonable one.

However, the Lufkin defendants also argue that even if it assumed warranty obligations for claims presented before the closing date, it nonetheless has no warranty obligations with respect to Madden.[111] In particular, the Lufkin defendants argue that Madden's claims do not qualify for the Hilbilt defendants' limited warranty because that warranty only extends to original owners.[112] In response, Madden argues that the term "original owner" in the warranty was intended to apply to the end user of the product, which it argues applies to Madden.[113] Madden further argues that even if the express warranty does not apply to its claims, the behavior of the parties sufficiently superseded the limits of the express warranty rules such that the defendants may be held liable for warranty obligations.[114]

---

[111] R. Doc. No. 41-1, at 15.
[112] *Id.* at 15–16.
[113] R. Doc. No. 78, at 10–11.
[114] *Id.* at 13.

While the parties make substantial arguments regarding the interpretation of the Hilark manufacturer warranty, the Lufkin defendants have not provided briefing with respect to the choice of law that applies to the manufacturer warranty. Instead, the Lufkin defendants seem to assume that Texas law also applies because the manufacturer's warranty appears as an attachment to the APA. However, the Court notes that this document appears in the APA's disclosure schedule as a separate agreement between the original manufacturer and its customers. The Court therefore has no basis to conclude that the Texas choice-of-law provision necessarily applies to the manufacturer's warranty.

Without a determination regarding what choice of law applies to the manufacturer's warranty, the Court cannot apply the proper rules of contractual interpretation. Nor can the Court assess any arguments regarding when warranty obligations may be properly waived or whether the behavior of the parties can supersede limits on an express warranty. The Lufkin defendants have therefore failed to establish, at this time, that they are entitled to summary judgment with respect to Madden's breach-of-warranty claims.

ii.    *Independent Liability*

Notwithstanding the Court's determination that the Lufkin defendants did not assume the Hilbilt defendants' LPLA and redhibition liabilities through the APA, that determination does not end the inquiry regarding whether the Lufkin defendants can be held liable for Madden's claims. In particular, Madden argues that

the Lufkin defendants can be held liable pursuant to the LPLA and for redhibition as apparent manufacturers.[115]

The LPLA's definition of manufacturer is not limited to those who actually manufacture a product. Instead, a manufacturer includes one "who labels a product as his own or who otherwise holds himself out to be the manufacturer of the product." La. R.S. § 9:2800.53(1)(a). Known as the apparent manufacturer doctrine, the LPLA's broad definition of manufacturer "allows a plaintiff to hold a seller or distributor liable for injuries caused by a product defect, when the seller leads a reasonable consumer to believe that it is the manufacturer of the product." *Martin v. Pham Le Brothers, LLC*, 330 So.3d 346, 352 (La. Ct. App. 2021). Claims for redhibition can likewise be brought against apparent manufacturers, *Vita v. Rooms to Go La. Corp.*, No. CIV. A. 13-6208, 2014 WL 6835913, at *5 (E.D. La. Dec. 3, 2014) (Barbier, J.), as well as "all sellers in the chain of sales back to the primary manufacturer." *Lovell v. Blazer Boats Inc.*, 104 So.3d 549, 553 & n.3 (La. Ct. App. 2012).

Whether an individual or entity has held themselves out as the manufacturer of a product is determined "by considering the viewpoint of the purchasing public and in light of the circumstances as of the time of purchase." *Id.* "Ultimately, the rationale behind the apparent manufacturer doctrine 'considers the perspective of the purchaser and his reliance placed upon the labeler of the product in many situations where the identity of the product's manufacturer is unclear in the sale of the product.'" *Pablovich v. Rooms to Go La. Corp.*, Civ. A. No. 20-617, 2021 WL 1401759

---

[115] *Id.* at 19–21.

(E.D. La. Apr. 14, 2021) (Fallon, J.) (quoting *Allstate Ins. Co. v. Fred's, Inc.*, 33 So.3d 976, 985 (La. Ct. App. 2010)). Applying this rationale in *Martin v. Pham Le Brothers, LLC*, the court concluded that a wholesaler was not an apparent manufacturer where it placed its initials on a photo of the product appearing in a catalog that it provided to customers. *Martin*, 330 So.3d at 352–53. In particular, the Court noted that there was no evidence that the plaintiff saw the catalog before purchasing the product. *Id.* at 353.

Madden argues that the apparent manufacturer doctrine applies to the Lufkin defendants because they allegedly "stepped into the businesses of the Hilbilt Defendants" and "continued to make and sell the same products, employ the same workers, were located in the same facilities, manufactured, installed and sold Hilbilt Dump bodies in the same way, used the same logos, and had the same distributors."[116] Madden points to *Pellecer v. Werner Co.*, No. 2023-CA-0694, 2024 WL 4500968 (La. Ct. App. Oct. 16, 2024), a case in which the defendant company that purchased certain assets of a ladder manufacturer through bankruptcy proceedings was held liable as an apparent manufacturer. The court there concluded that the defendant could still be liable as an apparent manufacturer despite the fact that the purchasing company did not exist when the ladder at issue was manufactured. *Id.* at *9–10. In that case, the purchasing company held the ladder out as its own through, for example, continuing to use the brand and logo of the manufacturing company. *Id.*

---

[116] R. Doc. No. 106, ¶ 217.

However, the holding of *Pellecer* relies on the fact that the plaintiff in that case continually argued that the ladder could have been purchased after June 2007—when the purchasing company acquired the assets of the manufacturing company in bankruptcy. *Id.* at *10. Based on the evidence, the court concluded that the apparent manufacturer doctrine applied because "the jury determined that by a preponderance of the evidence the [purchasing company] labeled the ladder as its own or held the ladder out as its own *at the time [the plaintiff's husband] bought the ladder.*" *Id.* at *20 (emphasis added) (internal quotations omitted).

Here, all of Madden's arguments for why the apparent manufacturer doctrine applies to the Lufkin defendants concern actions allegedly taken after executing the APA in 2023. Madden states in its amended complaint that it entered its agreement to lease the trucks in this case in 2021.[117] Madden therefore does not allege that the Lufkin defendants held themselves out as manufacturers of the dump bodies at the time that the dump bodies were purchased. Accordingly, Madden's claims against the Lufkin defendants for violations of the LPLA and for redhibition must be dismissed.

## IV.    CONCLUSION

For the foregoing reasons,

**IT IS ORDERED** that the Hilbilt defendants' motion for summary judgment is **GRANTED IN PART AND DENIED IN PART**. The motion is **GRANTED** to the extent that Madden's claims for negligence sounding in tort law are **DISMISSED**

---

[117] *Id.* ¶ 20.

**WITH PREJUDICE** against all defendants. The motion is **DENIED** in all other respects.

  **IT IS FURTHER ORDERED** that the Lufkin defendants' motion for summary judgment is **GRANTED IN PART AND DENIED IN PART**. The motion is **GRANTED** to the extent that Madden's claims against the Lufkin defendants for negligence sounding in tort, violations of the LPLA, and redhibition are **DISMISSED WITH PREJUDICE**. The motion is **DENIED** with respect to Madden's claims based in warranty and breach of contract.

  New Orleans, Louisiana, May 23, 2025.

                **LANCE M. AFRICK**
            **UNITED STATES DISTRICT JUDGE**